**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| KAMIAN SCHWARTZMAN, in his | : | |
| capacity as Receiver, | : | CIVIL ACTION |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| MORNINGSTAR, Inc. | : | No. 12-1647 |
| Defendant. | : | |

<u>**MEMORANDUM**</u>

**Schiller, J.**                                                **August 5, 2014**

On June 21, 2011, this Court granted partial summary judgment in favor of the Securities and Exchange Commission and against Robert Stinson, Jr., and entities that he controlled,[1] finding that they had run a Ponzi scheme in violation of the Securities Act of 1993 and the Securities Exchange Act of 1934. On July 1, 2013, the Court found that Stinson and his entities were jointly and severally liable for $14,051,246. The Court established a Receivership Estate, which included Stinson's entities, and appointed a Receiver to assume control over the Receivership Estate and to recover assets for defrauded investors.

The Receiver now seeks to recover investor losses from Morningstar, Inc., an investment research firm that the Receiver claims contributed to Stinson's fraud by listing and rating one of Stinson's funds, the STABL Fund, in its hedge fund database. Standing in the shoes of the entities in the Receivership Estate, which were defendants in the original SEC action, the Receiver brings claims against Morningstar for: (1) contribution under § 10(b) of the Securities Exchange Act and Rule 10b-5; (2) aiding and abetting breach of fiduciary duty; and (3) aiding

---

[1] These entities were Life's Good, Inc., Keystone State Capital Corporation, and four funds—Life's Good STABL Mortgage Fund, LLC ("STABL Fund"), Life's Good High Yield Mortgage Fund, LLC, Life's Good Capital Growth Fund, LLC, and IA Capital Fund, LLC.

and abetting fraud. The Court conducted a bench trial in January 2014. The Court finds for Morningstar on all three claims and enters the following findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

## I.      FINDINGS OF FACT

### A.      Stinson's Entities

1. Stinson founded the STABL Fund in September 2006. (Trial Ex. 15.)

2. The STABL Fund was one of six entities that Stinson used to operate his Ponzi scheme. The other entities were Keystone State Capital Corporation ("Keystone"); Life's Good, Inc.; Life's Good High Yield Mortgage Fund, LLC; Life's Good Capital Growth Fund, LLC; and IA Capital Fund, LLC. (Stip. Facts. ¶¶ 1, 2.)

3. Approximately 270 investors invested in Stinson's entities. (Stip. Facts ¶ 4.)

4. The Receiver presented the testimony of 40 investors in Stinson's entities. Of these investors, 38 invested in the STABL Fund. (Trial Ex. 1 [Wiley Report] App. C.) Investor 236 invested only in Life's Good, Inc., and Investor 258 invested only in the Life's Good Capital Growth Fund. (*Id.*)

5. Stinson began misusing investor money in mid-2007. (Stinson Dep. at 5-6.)

### B.      Morningstar's Database

6. Morningstar collects data regarding various investment vehicles, including hedge funds, and sells access to those data through various products. (Stip. Facts ¶ 8.)

7. Between April 2009 and July 2010, the relevant period for this case, Morningstar made data from its hedge fund database available to individuals and institutions through paid

subscriptions, or free short-term trial subscriptions, to certain Morningstar products. (Trial Tr. Jan. 14, 2014, at 11-12, 15; Trial Tr. Jan. 27, 2014, morning session, at 89.)

8. Two of Morningstar's products were Morningstar.com and Morningstar Alternative Investment Center, both of which were available online. Morningstar Alternative Investment Center was intended for institutional investors and was too expensive for most individual investors. (Trial Tr. Jan. 27, 2014, morning session, at 41, 93.)

9. Around 2009, the public could not easily access information about the performance of hedge funds. (Trial Tr. Jan. 27, 2014, afternoon session, at 26; Dang Dep. at 114.) Hedge fund databases were a principal method for investors to access performance information. (Trial Tr. Jan. 27, 2014, afternoon session, at 26-27; Dang Dep. at 114.)

10. Morningstar's hedge fund database contained about 8,000 hedge funds in 2009 and 2010. (Dang Dep. at 105.)

11. Hedge funds did not pay a fee to have their data included in Morningstar's hedge fund database. (Stip. Facts. ¶ 12.)

### C.    Addition of the STABL Fund to Morningstar's Database

12. On April 8, 2009, Nikhil Raheja, a Keystone employee, emailed Morningstar and asked that the STABL Fund be registered with Morningstar's hedge fund database. (Trial Tr. Jan. 14, 2014, at 16; Trial Ex. 21.) Raheja provided a biography for Robert Stinson and a completed questionnaire, both of which were required by Morningstar to list the hedge fund in its database. (Trial Tr. Jan. 14, 2014, at 17.)

13. The questionnaire submitted by Raheja to Morningstar stated that the STABL Fund's investment strategy was "[m]aking high-yield, short-term First Mortgage Loans to rehab

contractors, who purchase and improve distressed properties for ultimate resale or investment purposes." (Trial Ex. 15; Trial Tr. Jan. 14, 2014, at 17; Stip. Facts ¶ 14.)

14. The questionnaire submitted by Raheja also stated that the STABL Fund's returns had been 4% per quarter from October 2006 through December 2008, and that these data were "estimated." (Trial Ex. 15; Trial Tr. Jan. 14, 2014, at 18; Stip. Facts ¶ 15.)

15. The questionnaire submitted by Raheja included a question about the STABL Fund's strategy classification. (Trial Ex. 15.) Raheja was required to state the percentage of the STABL Fund's strategy that was "directional," the percentage that was "relative value," and the percentage that was "event driven." (*Id*.) Although the questionnaire stated that these percentages had to add up to 100, Raheja reported that the STABL Fund's strategy was 100% directional, 100% relative value, and 100% event-driven. (*Id*.) The STABL Fund's purported strategy—making short-term loans to rehab contractors—is best described as directional or event-driven. (Trial Tr. Jan. 27, morning session, at 66.)

16. All of the information provided by Raheja to Morningstar was false. (Stip. Facts ¶ 20.)

17. On April 9, 2009, Eda He, a data analyst at Morningstar, emailed Raheja seeking monthly returns data through March 2009. (Trial Ex. 21.) Eda He also wrote: "I also want to confirm the return since they are unchanged (4%) from inception date till December 2008." (*Id*.)

18. There is no evidence that Eda He recognized that the data provided by Raheja was false.

19. On April 13, 2009, Raheja wrote to Eda He that the STABL Fund had monthly returns of 1.333% from October 2006 through March 2009. (Trial Ex. 21.) These returns did not include fees to the STABL Fund. (Dang Dep. at 119-120.)

20. On April 13, 2009, Eda He entered the STABL Fund's data into Morningstar's database. (Trial Ex. 24.) Around that time, information about the STABL Fund began appearing in Morningstar's products on its website. (*Id.*)

21. Around April 17, 2009, Raheja and Gregory Greene of Keystone received passwords from Morningstar that enabled them to enter Morningstar's database and add or change information about the STABL Fund. (Trial Tr. Jan. 13, 2014, afternoon session, at 77; Trial Tr. Jan. 14, 2014, at 105; Trial Ex. 24; Dang Dep. at 87.) Morningstar retained the capacity to add or change data relating to the STABL Fund on Morningstar's website. (Trial Tr. Jan. 14, 2014, at 42; Dang Dep. at 31-32.)

22. As of June 2009, Morningstar's database reflected that the STABL Fund had been generating monthly returns in a repeating pattern of 0%, 0%, 4% from September 2006 to April 2009. (Trial Ex. 115; Trial Tr. Jan. 14, 2014, at 104-106.)

23. There is no evidence regarding whether Morningstar or Keystone entered monthly returns data of 0%, 0%, 4% into Morningstar's database. (*See* Trial Tr. Jan. 13, 2014, afternoon session, at 79.)

24. On August 2, 2009, Morningstar implemented a tracking system that reflected who entered or changed data in its database. (Trial Tr. Jan. 14, 2014, at 80-83.)

25. From August 12, 2009 to June 30, 2010, Raheja was the only person who entered or changed data relating to the STABL Fund in Morningstar's database. (Trial Tr. Jan. 14, 2014, at 85-86.)

26. As of June 2009, if not earlier, Morningstar included the STABL Fund in a list of hedge funds displayed on Morningstar.com in descending order of their annual returns. (Trial Ex. 115.)

27. As of June 2009, if not earlier, Morningstar published a report ("Morningstar Report") about the STABL Fund on Morningstar.com. (Trial Ex. 115.) The Morningstar Report included the following information about the STABL Fund: that the fund had annual returns of 17%, the STABL Fund's investment strategy, a biography for Robert Stinson, and the identities of the STABL Fund's administrator, auditor, custodian, and attorney. (Trial Ex. 115.) All of this information was provided by Raheja, and all of it was false, except for the name of the STABL Fund's administrator. (Trial Ex. 15; Stinson Dep. at 10; Stip. Facts ¶ 20.) The Morningstar Report also stated that the minimum investment in the STABL Fund was $5,000, following information that Raheja provided. (Trial Ex. 115.)

28. The Morningstar Report included "risk measurement" statistics for the STABL Fund, such as standard deviation, which Morningstar calculated based on the returns data submitted by Raheja. (Trial Tr. Jan. 14, 2014, at 19-21; Trial Ex. 115.) The Morningstar Report also stated that the STABL Fund's returns were positive for four months of the year and negative for zero months of the year. (Trial Ex. 115.)

29. The first page of the Morningstar Report stated: "This information is . . . not warranted to be accurate, timely or complete. Morningstar depends on each individual hedge fund to provide it with accurate information. To the extent that these data are deficient in any way, the information contained herein may be affected." (Trial Ex. 115.)

30. As of April 2010, if not earlier, Morningstar published information about the STABL Fund on Morningstar Alternative Investment Center. (Trial Ex. 131.) This information included the STABL Fund's annual returns of 17%, the fund's net assets, a graph reflecting the fund's monthly returns, and the fund's investment strategy ("[m]aking high-yield, short-term First Mortgage Loans to rehab contractors"). (*Id.*)

31. Morningstar published several different versions of Stinson's biography, which Stinson had submitted. The biographies were not obviously false, and the various versions were not inconsistent. (Trial Exs. 33, 38, 114, 125.)

**D.    Morningstar's Five-Star Rating of the STABL Fund**

32.  In 2008, Morningstar developed a Star Rating System, which rates funds from one to five stars based on past performance. (Stip. Facts ¶¶ 9, 10.)

33. Under the Star Rating System, hedge funds were eligible to receive a star rating after reporting 38 months of returns. (Trial Ex. 2 at 2; Trial Tr. Jan. 27, 2014, morning session, at 53.)

34. The STABL Fund received a five-star rating from Morningstar in December 2009. (Stip. Facts ¶ 24.)

35. The STABL Fund's five-star rating was published in Morningstar Alternative Investment Center and in the Morningstar Report on Morningstar.com. (Trial Exs. 125, 131.)

36. Morningstar's Rating Methodology for Hedge Funds ("Rating Methodology"), which described the process by which Morningstar selected a star rating, was publicly available on the Internet. (Trial Tr. Jan. 27, 2014, morning session, at 121.)

37. According to Morningstar's Rating Methodology, Morningstar rated hedge funds by: (1) selecting a category for the hedge fund based on the fund's investment strategy; (2) accepting as essentially accurate the returns data that a hedge fund reported; (3) "unsmoothing" these returns to counteract the tendency by hedge fund managers to report smoother returns than may be strictly accurate; (4) adjusting the returns to reflect the opportunity that the investor gives up to invest in a risk-free security; and (5) adjusting the returns further to reflect

Morningstar's belief about investors' preference for particular returns patterns over others. (Trial Ex. 61.) The resulting figure is Morningstar's Risk-Adjusted Return ("MRAR"). (*Id.*)

38. The hedge funds with a MRAR in the highest 10% of MRARs in a category received five stars. (Trial Ex. 61 at 23; Stip. Facts ¶ 10.)

39. Morningstar placed the STABL Fund in the Global Debt category based on its self-reported investment strategy. (Trial Tr. Jan. 27, 2014, morning session, at 77-78.)

### E.    Morningstar's Review of Hedge Fund Data

40. The responsibility of a data analyst such as Eda He was to collect data from hedge funds and add those data to Morningstar's database. (*Id.* at 8.) If the data looked unusual, the data analyst was expected to verify with the hedge fund manager that the data were what he or she intended to report. (*Id.* at 39.)

41. Beyond confirming that the data submitted by hedge funds were what the hedge fund intended to report, Morningstar did not check hedge fund data for accuracy. (Dang Dep. at 110.)

42. Morningstar had a series of "business rules," and it "filtered out and flagged" data that did not conform to its rules. (Trial Tr. Jan. 14, 2014, at 56-57.) One business rule required hedge fund manager biographies to be in English and to be of a particular length. (*Id.* at 57.) Another business rule limited the length of the description of the fund's strategy. (*Id.* at 62.) A third business rule identified hedge funds with monthly returns greater than 20% or less than negative 20%, and funds that reported four or more consecutive months with 0% returns. (Trial Ex. 82; Trial Tr. Jan. 14, 2014, at 66.) A fourth business rule screened for funds with assets under management greater than $1 billion or less than $100,000, and monthly fluctuations greater than 20%. (Trial Ex. 107; Trial Tr. Jan. 14, 2014, at 100-101.)

The data reported by the STABL Fund complied with all of the above business rules. (Trial Tr. Jan. 14, 2014, at 69, 101.)

**F.    Morningstar's Statements About its Database**

43. Morningstar stated on its website that it "uses proprietary screens and quality assurance tests at each stage—from collection to delivery—to provide clients with the cleanest information." (Trial Ex. 4.) There is no evidence that any investor viewed or relied on this statement.

44. Morningstar stated in its marketing material that "[a]ll data is collected directly from hedge fund managers and reviewed by Morningstar data analysts for accuracy and completeness." (Trial Ex. 4.) There is no evidence that any investor viewed or relied on this statement. Morningstar intended this statement to convey that data analysts ensured that data were correctly entered into the database (i.e., that the figures were what hedge fund managers intended them to be), and that no data were missing from the database. (Dang Dep. at 25-30, 109.)

45. Morningstar stated in its Rating Methodology that it chose a category for each hedge fund based on the hedge fund's "memorandum document, manager-provided investment strategy descriptions and supporting data, conversations with portfolio managers, cluster analysis, stepwise regression, and portfolio statistics acquired via surveys." (Trial Ex. 61 at 3.) Morningstar's Rating Methodology went on to state: "Morningstar does not have access to portfolio holdings for hedge funds and must instead rely on other information provided by the asset managers." (*Id*.) There is no evidence that Morningstar looked at the STABL Fund's memorandum document or performed a cluster analysis or stepwise regression with respect to the STABL Fund before choosing to place it in the Global Debt category. (Trial Tr. Jan. 13, 2014, morning session, at 115, 118-119.)

46. None of the 40 testifying investors viewed Morningstar's statement about the factors that it would consider in selecting a category for a hedge fund.

47. Morningstar stated in its Rating Methodology that hedge funds could report estimated and unaudited data to Morningstar, and that Morningstar might calculate star ratings based on estimated or unaudited data. (Trial Ex. 62 at 14, 25.)

48. In generating and displaying a star rating for a hedge fund, Morningstar did not distinguish between audited and unaudited returns data, or between estimated and final returns data. (Trial Tr. Jan. 27, 2014, at 57-58.)

49. The Rating Methodology stated that Morningstar used an "unfilled" star-rating icon for hedge fund ratings to distinguish them from ratings of other investment vehicles. (Trial Ex. 62 at 25.) Due to a programming error, Morningstar's ratings of hedge funds appeared with filled star icons on Morningstar.com. (Trial Tr. Jan. 27, 2014, morning session, at 34.) However, there is no evidence that any investor who viewed a Morningstar document with a star rating understood the difference between filled and unfilled stars or relied on that distinction in investing.

50. The Morningstar Report on the STABL Fund, available on Morningstar.com, included the following language, on the same page as returns data and a description of the fund's strategy: "This information is . . . not warranted to be accurate, timely or complete. Morningstar depends on each individual hedge fund to provide it with accurate information. To the extent that these data are deficient in any way, the information contained herein may be affected." (Exs. 114, 115; Trial Tr. Jan. 14, 2014, at 80.)

51. The Rating Methodology stated that "hedge fund data are generally self-reported and not subject to independent verification so that errors or deficiencies in those data can go

undiscovered and potentially affect the Morningstar Rating for a particular hedge fund."
(Trial Ex. 62 at 25.) Morningstar further stated in its Rating Methodology: "A particular
hedge fund may, whether intentionally or not, submit inaccurate returns data to Morningstar
or its investors. Without on-site investigation of each hedge fund's accounting records, it is
very difficult to ascertain whether this is occurring." (*Id.*)

52. In order to view hedge fund data on Morningstar's website, an individual had to subscribe to
a Morningstar product, either by paying a fee or by signing up for a free trial subscription.
(Trial Tr. Jan. 27, 2014, morning session, at 89; Trial Tr. Jan. 14, 2014, at 11.)

53. Subscribers to Morningstar.com in 2009 and 2010 were required to agree to the following
statements: "Neither Morningstar nor its content providers warrant the accuracy,
completeness, or timeliness of the web site;" and "I agree that Morningstar provides data
given to it by hedge funds and third party entities, and does not verify the adequacy, accuracy
or completeness of the information provided." (Trial Exs. 90, 91; Trial Tr. Jan. 14, 2014, at
14-15, 96-98.)

54. Subscribers to Morningstar Alternative Investment Center in 2009 and 2010 were required to
check a box stating: "I acknowledge (i) that Morningstar provides data given to it by hedge
funds and other third parties, and does not verify the adequacy, accuracy or completeness of
the information provided, and (ii) that Morningstar is not responsible for the data and
provides no warranty, expressed or implied, or any kind whatsoever." (Trial Ex. 97; Trial Tr.
Jan. 14, 2014, at 14-15, 98-99.)

### G.    Morningstar's Risk Flags

55. In January 2010, Morningstar developed its Operational Risk Flag Methodology, a system for assigning "risk flags" to hedge funds. (Trial Ex. 66.) The risk flags were titled "Administrator," "Registration," "Auditor," and "Return Pattern." (*Id*. at 4.)

56. In early April 2010, Morningstar assigned risk flags to various funds, according to its methodology, and published these risk flags on the Alternative Investment Center website, but not on Morningstar.com. (Trial Tr. Jan. 27, 2014, morning session, at 92.)

57. A risk flag for "Administrator" indicated one of three things: the fund did not name an administrator, the named administrator was a "related party," or the administrator did not serve at least five other hedge fund firms in the Morningstar database. (Trial Ex. 66 at 5.) A risk flag for "Auditor" indicated one of three things: the fund did not name an auditor, the named auditor was a "related party," or the auditor did not serve at least five other hedge fund firms in the Morningstar database. (*Id*.) A risk flag for "Registration" indicated that the hedge fund did not register with a regulatory body in a country that Morningstar deems "developed." (*Id*.) A risk flag for "Returns Pattern" indicated that the hedge fund's returns were serially correlated in a particular way. (*Id*. at 6.)

58. Morningstar developed its risk flag methodology in recognition of the fact that light regulation of hedge funds may allow hedge fund managers to engage in fraud or mismanagement. (Trial Ex. 314.) Morningstar intended that a risk flag convey to an investor that he should conduct more research before investing in a particular hedge fund. (*Id*.; Trial Tr. Jan. 27, 2014, morning session, at 95.)

59. Morningstar assigned three risk flags to the STABL Fund—"Auditor," "Administrator," and "Registration." (Trial Ex. 104.) The STABL Fund did not receive a risk flag for "Return Pattern." (*Id.*)

60. The STABL Fund's returns did not meet the requirements of the "Return Pattern" risk flag. (Trial Tr. Jan. 13, 2014, afternoon session, at 26-27.)

61. The STABL Fund triggered risk flags for "Auditor" and "Administrator" because the fund's reported auditor and administrator were not listed with at least five other funds in Morningstar's database. (Trial Tr. Jan. 13, 2014, morning session, at 141-42.)

62. About half of the funds in Morningstar's database had three or four risk flags. (Trial Tr. Jan. 14, 2014, at 95; Trial Tr. Jan. 27, 2014, morning session, at 132.)

63. Of the 40 testifying investors, 19 invested in Stinson's funds after Morningstar assigned the three risk flags to the STABL Fund in April 2010. (Dep. Inv. 37 at 12, 16-17; Dep. Inv. 38 at 25; Dep. Inv. 45 at 9; Dep. Inv. 47 at 13; Dep. Inv. 85 at 18; Dep. Inv. 137 at 12; Dep. Inv. 165 at 30; Dep. Inv. 206 at 58-59; Dep. Inv. 236 at 32-33; Dep. Inv. 248 at 25; Dep. Inv. 252 at 18; Dep. Inv. 261 at 19; Wiley Report App. C (reflecting that Investors 27, 61, 91, 131, 175, 233 and Tom Dunkel invested in the STABL Fund in or after April 2010.)

**H.    Morningstar's Lack of Awareness of Fraud**

64. Besides Stinson, none of the employees of Stinson's entities was aware that he was conducting a Ponzi scheme. (Stinson Dep. at 93.)

65. Stinson did not tell anyone associated with Morningstar that he was misusing investor money or that the returns the STABL Fund had reported were false. (Stinson Dep. at 15.)

66. Morningstar never audited the STABL Fund. (Stinson Dep. at 58.)

67. There is no evidence that any Morningstar employee knew that the information submitted by the STABL Fund and published on Morningstar's website was false.

68. Stinson did not inform Morningstar that he would use the Morningstar rating in materials that he provided to investors. (Stinson Dep. at 19.)

69. The industry standard for hedge fund databases is to accept data reported by hedge funds, and not to audit these data. (Trial Tr. Jan. 27, 2014, afternoon session, at 28-29.)

70. Barclays Bank PLC, a financial services provider, also reported in its hedge fund database ("DataFinder") that the STABL Fund had annual returns of about 17%. (Trial Ex. 150 at 14-17; Trial Ex. 309; Trial Tr. Jan. 27, 2014, afternoon session, at 49-52.)

71. Constant quarterly returns of 4%, which the STABL Fund reported to Morningstar, are unusual, but plausible. (Dang Dep. at 77-78; Trial Tr. Jan. 27, 2014, afternoon session, at 40, 71-72.) There are three plausible explanations for such returns. (Trial Tr. Jan. 27, 2014, afternoon session, at 40-46.) First, for tax reasons, investors could have arranged to lend money to the fund, rather than investing directly in it, and a maximum or minimum interest rate could have created constant quarterly returns. (*Id*. at 41-42.) Second, returns could be constant for a fund that pursues a strategy that has a high probability of achieving a stable return and a low probability of incurring a catastrophic loss. (*Id*. at 42-43.) Third, the hedge fund could have agreed to pay investors 4% at the end of each quarter. (*Id*. at 43.)

72. Because the STABL Fund reported to Morningstar that its returns did not include fees to the operators of the fund, the fund was representing that it earned more than 17% per year on its loans to rehab contractors. (Trial Tr. Jan. 13, 2014, afternoon session, at 7.) Morningstar could not have known the STABL Fund's gross returns because the STABL Fund did not

report how it calculated fees. (*Id*. at 6-7.) Gross returns could have been as low as 20% or as high as 27%. (*Id*. at 10; Trial Tr. Jan. 13, 2014, morning session, at 75.)

73. The size of the STABL Fund's reported annual 17% returns, net of fees, was plausible. (Trial Tr. Jan. 27, 2014, afternoon session, at 45-46.)

74. When the Receiver's expert, David Wiley, searched in Morningstar's database within the Global Debt category for the word "mortgage" and other words in the STABL Fund's description of its investment strategy, he did not see another hedge fund with returns similar to the STABL Fund's returns. (Trial Tr. Jan. 13, 2014, afternoon session, at 13.) However, Wiley did not look at hedge funds in other Morningstar categories or hedge funds in databases other than Morningstar's. (*Id*. at 11-13.)

75. The Global Debt category contained about 440 hedge funds at the time of Wiley's search. (Trial Tr. Jan. 13, 2014, morning session, at 81.) Many hedge funds do not report to any hedge fund database, and some hedge funds report to databases other than Morningstar. (Trial Tr. Jan. 27, 2014, afternoon session, at 27; Trial Tr. Jan. 13, 2014, afternoon session, at 3-4.)

76. Raheja informed Eda He in April 2009 that the STABL Fund earned returns of 1.333% in the first two months of its existence, causing the fund's assets under management to grow from $90,000 in September 2006 to more than $1.1 million by October 31, 2006. (Trial Ex. 21.) It was unusual for a hedge fund with the STABL Fund's reported investment strategy to grow so quickly, given that it takes time for a hedge fund to gather assets, develop a strategy, set up infrastructure, find properties, and find contractors. (Trial Tr. Jan. 13, morning session, at 105-106.)

77. The STABL Fund reported a constant Net Asset Value (NAV) per unit of $5,000, which did not change from the fund's inception. (Trial Ex. 43; Trial Tr. Jan. 13, 2014, morning session, at 124-25.) NAV per unit represents all assets minus all liabilities divided by the number of outstanding shares. (Trial Tr. Jan. 13, 2014, morning session, at 122.) A possible explanation for a constant NAV per unit is that the fund treats the reinvestment of returns as new units in the fund. (Trial Tr. Jan. 27, 2014, afternoon session, at 55-56.) Although Wiley did not see other hedge funds in Morningstar's Global Debt category with a similarly consistent NAV per unit, many hedge funds are not in Morningstar's Global Debt category. (Trial Tr. Jan. 13, 2014, morning session, at 125; Trial Tr. Jan. 27, 2014, afternoon session, at 27.)

78. It was reasonable for Morningstar to place the STABL Fund in the Global Debt category because that category best matched the STABL Fund's reported investment strategy. (Trial Tr. Jan. 13, 2014, afternoon session, at 218; Trial Tr. Jan. 27, 2014, afternoon session, at 52.)

79. On Alternative Investment Center, Morningstar treated returns of 0% as positive. (Trial Tr. Jan. 27, 2014, morning session, at 82.) Therefore, in charts listing the number months in which the STABL Fund had positive and negative returns, months in which the returns were 0% were listed as positive months on Alternative Investment Center. (Trial Ex. 131.) However, other charts on Alternative Investment Center made clear that the STABL Fund was reporting returns of 0% or close to 0% for several months out of the year. (*Id.*)

80. On Morningstar.com, Morningstar did not treat a return of 0% as positive. (Trial Tr. Jan. 27, 2014, morning session, at 82.)

81. Morningstar removed the STABL Fund from its database on August 19, 2010, after learning of Stinson's fraud. (Trial Tr. Jan. 14, 2014, at 87.)

I.      **Limitations on the Use of Morningstar's Database**

82. Keystone had subscriptions to Morningstar.com and Morningstar Alternative Investment Center, which enabled Keystone to enter Morningstar's website, using logins and passwords, and view information about hedge funds, including the STABL Fund. (Trial Ex. 89; Trial Tr. Jan. 14, 2014, at 11-12.)

83. Employees of Keystone or Life's Good printed documents regarding the STABL Fund from Morningstar's website and sent these documents to prospective investors and investment advisors, in violation of Morningstar's user agreements. (Trial Exs. 90, 94, 97; Stip. Facts ¶ 27.)

84. Employees of Keystone or Life's Good shared Morningstar login and password information with others, in violation of Morningstar's user agreements. (Trial Ex. 90, 94, 97; Stip. Facts ¶ 28.)

85. Although Morningstar allowed hedge funds to apply for a license to use the Morningstar Rating to promote the fund to investors, Keystone did not enter into any such licensing agreement with Morningstar. (Trial Ex. 3; Greene Dep. at 83; Trial Tr. Jan. 27, 2014, at 11-13.)

86. Morningstar pitched its database to hedge funds, including the STABL Fund, as a tool that could bring those funds "much exposure" given Morningstar's large number of subscribers. (Trial Ex. 11.)

87. Subscribers to Morningstar.com and Morningstar Alternative Investment Center were required to check a box stating that they were accredited investors, as defined by SEC regulations. (Trial Exs. 94, 97; Trial Tr. Jan. 13, 2014, afternoon session, at 21; Trial Tr. Jan.

14, 2014, at 14-15; Trial Tr. Jan 27, 2014, morning session, at 123-124; Dang Dep. at 106-07.)

### J.     Investors in the STABL Fund

88. All 40 testifying investors first learned of the STABL Fund from a person who was not affiliated with Morningstar. These investors first learned of the STABL Fund from financial advisors, friends, relatives, acquaintances, or employees of Keystone.

*1.     Morningstar's statements of which investors were aware*

89. Twenty-six of the 40 investors viewed documents published on Morningstar's website that contained information about the STABL Fund. These investors either received printouts of the documents from persons not affiliated with Morningstar or were given login information for Morningstar's website by persons not affiliated with Morningstar. These investors were Investors 4, 37, 38, 44, 45, 47, 55, 60, 61, 69, 70, 85, 91, 98, 104 (JAH), 104 (JWH), 156, 163, 165, 175, 189, 211, 258, David Sharff, Tom Dunkel, and Anthony Farrow.

90. Of the 14 investors who did not view documents published by Morningstar, 12 were told about the five-star rating, or about a high rating, by a person unaffiliated with Morningstar. These 12 investors were Investors 27, 110, 131, 134, 137, 155, 206, 219, 236, 248, 252, and 261. The remaining investors, Investors 14 and 233, did not see or hear about any statements by Morningstar relating to the STABL Fund before they invested in the STABL Fund.

91. A total of 12 investors saw documents published by Morningstar with a five-star rating of the STABL Fund. (Dep. Inv. 38 at 33; Dep. Inv. 47 at 8, 11; Dep. Inv. 91 at 54 & Ex. 1 at 4640; Dep. Inv. 98 at 16; Dep. Inv. 104 (JAH) at 32-33 & Ex. 2; Dep. Inv. 104 (JWH) at 7-8; Dep. Inv. 163 at 21; Dep. Inv. 165 at 25; Dep. Inv. 175 at 23 & Ex. 1 at 4958; Dep. Inv. 189 at 14-

15; Trial Tr. Jan. 21, 2014, at 68 [Sharff Testimony] & Trial Ex. 201; Trial Tr. Jan. 21, 2014, at 39 [Dunkel Testimony].).

92. Twenty investors learned that Morningstar had given the STABL Fund a five-star rating, or a high rating, from a person unaffiliated with Morningstar or document not published by Morningstar. (Dep. Inv. 27 at 12, 27; Dep. Inv. 37 at 15; Dep. Inv. 45 at 21; Dep. Inv. 60 at 17-18; Dep. Inv. 85 at 22-23; Dep. Inv. 110 at 11, 24-25; Dep. Inv. 131 at 9, 12, 13; Dep. Inv. 134 at 15; Dep. Inv. 137 at 15; Dep. Inv. 155 at 11; Dep. Inv. 156 at 29; Dep. Inv. 206 at 16-17, 56-57; Dep. Inv. 211 at 24; Dep. Inv. 219 at 70, Dep. Inv. 236 at 42; Dep. Inv. 248 at 8; Dep. Inv. 252 at 12-13; Dep. Inv. 258 at 21-22; Dep. Inv. 261 at 13-15; Trial Tr. Jan 21, 2014, at 17 [Farrow Testimony].)

93. Of the 26 investors who viewed documents published by Morningstar, 16 viewed portions of the Morningstar Report. All 16 investors viewed the first page of the report, which contained the following information: (1) the STABL Fund's returns (about 17% annually); (2) the STABL Fund's investment strategy ("Making high-yield, short term First Mortgage Loans to rehab contractors, who purchase and improve distressed properties for ultimate resale or investment purposes"); and (3) a disclaimer ("This information is . . . not warranted to be accurate, timely or complete. Morningstar depends on each individual hedge fund to provide it with accurate information. To the extent that these data are deficient in any way, the information contained herein may be affected."). (Dep. Inv. 4 Ex. 1 at 3932; Dep. Inv. 38 Ex. 1 at 13; Dep. Inv. 44 at 46-47 Ex. 3; Dep. Inv. 45 Ex. 1 at 4217; Dep. Inv. 60 Ex. 1 at 4291; Dep. Inv. 61 Ex. 1 at 4291; Dep. Inv. 69 Ex. 3 at 52; Dep. Inv. 70 Ex. 3 at 52; Dep. Inv. 85 at 31 & Ex. 1 at 2728; Dep. Inv. 104 (JAH) at 32 & Ex. 2 at 4217 (applying also to Investor 104

(JWH)); Dep. Dep. Inv. 163 Ex. 4 at 64; Inv. 165 Ex. 2 at 4217; Dep. Inv. 211 Ex. 2 at 21;

Dep. Inv. 258 Ex. 10; Tr. Jan. 21, 2014, at 66 [Sharff Testimony] & Trial Ex. 200.)

94. Of the 26 investors who viewed Morningstar documents, three investors viewed a webpage
that was similar to the first page of the Morningstar Report, but which may not have been
identical. (Trial Tr. Jan 21, 2014, at 13 [Farrow Testimony] & Ex. 127; Trial Tr. Jan 21,
2014, at 39 [Dunkel Testimony] & Ex. 6; Dep. Inv. 98 at 15 & Ex. 2 at 408.)

95. Of the 16 investors who viewed the first page of the Morningstar Report, seven investors
viewed another page of the Morningstar Report which contained the following "risk
measurements" for the STABL Fund: standard deviation, skewness, kurtosis, and the Sharpe
and Sortino Ratios. That page also stated the number of months in which the fund had
positive and negative returns. (Dep. Inv. 4 Ex. 1 at 3934; Dep. Inv. 60 Ex. 1 at 4293; Dep.
Inv. 61 Ex. 1 at 4293; Dep. Inv. 163 Ex. 4 at 66; Dep. Inv. 211 Ex. 2 at 23; Dep. Inv. 258 Ex.
10; Trial Tr. Jan. 21, 2014 [Sharff Testimony] at 66 & Trial Ex. 200.) The risk measurements
were based on the returns data submitted by the STABL Fund. (Trial Tr. Jan. 14, 2014, at 19-
21.) All of the investors who viewed this page also viewed the disclaimer on the first page of
the Morningstar Report.

96. Of the 16 investors who viewed the first page of the Morningstar Report, nine investors
viewed another page of the Morningstar Report which contained Stinson's biography. (Dep.
Inv. 4 Ex. 1 at 3935; Dep. Inv. 44 Ex. 2 at 34; Dep. Inv. 60 Ex. 1 at 4294; Dep. Inv. 61 Ex. 1
at 4294; Dep. Inv. 69 Ex. 3 at 54; Dep. Inv. 70 Ex. 3 at 54; Dep. Inv. No. 85 at 19-20 Ex. 1 at
2731; Dep. Inv. 163 Ex. 4 at 67; Tr. Jan. 21, 2014 [Sharff Testimony] at 66 & Trial Ex. 200.)
All of the investors who viewed this page also viewed the disclaimer on the first page of the
Morningstar Report.

97. Of the 16 investors who viewed the first page of the Morningstar Report, six investors viewed another page of the Morningstar Report which contained the names of the STABL Fund's administrator, auditor, custodian, and legal counsel. (Dep. Inv. 4 Ex. 1 at 3937; Dep. Inv. 60 Ex. 1 at 4296; Dep. Inv. 61 Ex. 1 at 4296; Dep. Inv. 69 Ex. 3 at 56; Dep. Inv. 70 Ex. 3 at 56; Trial Tr. Jan. 21, 2014 [Sharff Testimony] at 66 & Trial Ex. 200.) All of the investors who viewed this page also viewed the disclaimer on the first page of the Morningstar Report.

98. Ten investors viewed a chart published by Morningstar ("Performance Listing") that listed returns information for various hedge funds, including annual returns of about 17% for the STABL Fund. (Dep. Inv. 44 at 31 & Ex. 2 at 32; Dep. Inv. 60 at 40, 69 & Ex. 1 at 4287; Dep. Inv. 61 Ex. 1 at 4287; Dep. Inv. 69 Ex. 3 at 53; Dep. Inv. 70 Ex. 3 at 53; Dep. Inv. 85 at 18 & Ex. 1 at 2723; Dep. Inv. No. 156 at 20 & Ex. 2; Dep. Inv. 211 Ex. 2 at 17; Trial Tr. Jan 21, 2014, at 14 [Farrow Testimony] & Trial Exs. 158, 159; Trial Tr. Jan. 21, 2014, at 66 [Sharff Testimony] & Trial Ex. 200.) This document did not include a disclaimer stating that the information was not warranted to be accurate.

99. Four investors saw a chart published by Morningstar ("Statistic Table") that stated the number of months that the STABL Fund had positive returns and the number of months that the STABL Fund had negative returns. (Dep. Inv. 45 Ex. 1 at 4219; Dep. Inv. 98 at 16-17; Dep. Inv. 165 Ex. 2 at 4219; Dep. Inv. 175 Ex. 1 at 4975.) This document did not include a disclaimer that the information was not warranted to be accurate.

100. Three investors viewed a webpage published by Morningstar Alternative Investment Center. (Dep. Inv. 37 Ex. 4 at 472; Dep. Inv. 91 Ex. 1 at 4640; Dep. Inv. 175 Ex. 1 at 4958.) This webpage depicted a chart mapping the STABL Fund's growth and included the STABL Fund's net assets and returns. (*Id.*) The webpage that Investors 37 and 175 viewed also

included a description of the STABL Fund's investment strategy. None of these webpages included a disclaimer stating that the information was not warranted to be accurate.

2.   *Reliance on Morningstar's statements*

101. Fifteen investors stated that they would not have invested if they had not known about Morningstar's listing or rating of the STABL Fund. (Dep. Inv. 4 at 20; Dep. Inv. 27 at 20; Dep. Inv. 38 at 24, Dep. Inv. 47 at 27; Dep. Inv. 85 at 15; Dep. Inv. 91 at 33; Dep. Inv. 104 (JAH) at 27; Dep. Inv. 134 at 26; Dep. Inv. 156 at 19; Dep. Inv. 163 at 16; Dep. Inv. 189 at 25-27; Dep. Inv. 206 at 63; Dep. Inv. 211 at 18; Dep. Inv. 236 at 24; Dep. Inv. 248 at 17.) However, four of these investors relied substantially on statements by people who were not affiliated with Morningstar. (Dep. Inv. 104 (JAH) at 27-28; Dep. Inv. 163 at 11-12, 31-32; Dep. Inv. 236 at 22, 24; Dep. Inv. 248 at 9, 11.)

102. An additional 22 investors stated that Morningstar's listing or rating of the STABL Fund influenced their decision to invest, but did not testify that they would not have invested if not for Morningstar's statements. (Dep. Inv. 37 at 23; Dep. Inv. 44 at 32; Dep. Inv. 45 at 21-22; Dep. Inv. 55 at 21; Dep. Inv. 60 at 67; Dep. Inv. 61 at 43; Dep. Inv. 69 at 13; Dep. Inv. 70 at 24-25, Dep. Inv. 98 at 20, Dep. Inv. 104 (JWH) at 9;  Dep. Inv. 110, at 36-37; Dep. Inv. 131 at 12, Dep. Inv. 137 at 19-20; Dep. Inv. 155 at 30-31; Dep. Inv. 165 at 24-25; Dep. Inv. 175 at 33-34; Dep. Inv. 252 at 25; Dep. Inv. 258 at 33; Dep. Inv. 261 at 20; Trial Tr. Jan. 21, 2014, at 42 [Dunkel Testimony]; Trial Tr. Jan. 21, 2014, at 75 [Sharff Testimony]; Trial Tr. Jan. 21, 2014, at 17-18 [Farrow Testimony].)

103. In deciding to invest in the STABL Fund, most of the investors listed in the previous paragraph relied heavily on the advice of a financial advisor, a friend, Stinson, a Keystone employee, or another person who was not affiliated with Morningstar. (*See* Dep. Inv. 44 at

11-12, 31, 61, 65-66; Dep. Inv. 45 at 19; Dep. Inv. 55 at 7-8, 10, 11, 21-22; Dep. Inv. 69 at 5,

12; Dep. Inv. 70 at 7-8; Dep. Inv. 104 (JWH) at 9; Dep. Inv. 131 at 28; Dep. Inv. 165 at 12,

15; Dep. Inv. 175 at 16-17; Dep. Inv. 219 at 11-12;  Dep. Inv. 252 at 14; Trial Tr. Jan. 21,

2014 at 10, 20-21 [Farrow Testimony]; Trial Tr. Jan. 21, 2014 at 45-46 [Dunkel Testimony];

Trial Tr. Jan. 21, 2014 at 104-5, 116 & Trial Ex. 308 [Sharff Testimony and Email].)

104. Three investors became aware of Morningstar's listing and rating only after they made their

entire investment in the STABL Fund. (Dep. Inv. 14 at 18; Dep. Inv. 219 at 69; Dep. Inv. 233

at 36.)

105. Another three investors began investing with Stinson's funds before Morningstar listed or

rated the STABL Fund. (Dep. Inv. 69 at 7; Dep. Inv. 70 at 9-10; Trial Tr. Jan. 21, 2014, at

104-105 [Sharff Testimony].)

106. Five investors stated that they may have invested even if they had not been aware of

Morningstar's listing or rating of the STABL Fund. (Dep. Inv. 55 at 21; Dep. Inv. 60 at 67;

Dep. Inv. 70 at 24-25 (applying also to Investor 69); Dep. Inv. 98 at 20.)

107. Persons not affiliated with Morningstar misled at least five investors about the significance

of a Morningstar rating or about Morningstar's scrutiny of hedge fund data. (Dep. Inv. 60 at

17-19 (stating that Stinson gave her the impression that the STABL Fund had worked for a

long time to obtain a five-star rating); Dep. Inv. 131 at 9, 12 (stating that a financial advisor

told him that the five-star rating gave the fund credibility and substance); Dep. Inv. 137 at 11,

27 (stating that a financial advisor told him that the five-star rating confirmed the strength

and stability of the STABL Fund, and also led him to believe that Morningstar researched

and evaluated businesses before giving them a rating); Dep. Inv. 189 at 35, 37 (stating that a

financial advisor told him that a five-star rating is "very difficult to achieve," and that a

Morningstar analyst spends a month in the office of a hedge fund before listing or rating it); Trial Tr. Jan. 21, 2014 at 46, 56 [Dunkel Testimony] (testifying that he would not have relied on Morningstar if Stinson had not told him that Morningstar had visited Stinson's office and reviewed his files).).

108. Twenty-one investors believed that Morningstar investigated hedge funds or verified returns data before listing or rating the funds, but none testified that he saw a statement to that effect by Morningstar. Instead, the bases for investors' belief were their own assumptions or statements by third parties unaffiliated with Morningstar. (Dep. Inv. 27 at 18, 26; Dep. Inv. 37 at 17-18, 33-35; Dep. Inv. 38 at 18-19, 30; Dep. Inv. 44 at 43, 45; Dep. Inv. 47 at 19, 32; Dep. Inv. 55 at 29-30; Dep. Inv. 60 at 43, 45; Dep. Inv. 61 at 25-26; Dep. Inv. 85 at 30; Dep. Inv. 91 at 20, 47; Dep. Inv. 137 at 27-28; Dep. Inv. 165 at 43-44; Dep. Inv. 175 at 63; Dep. Inv. 189 at 37; Dep. Inv. 211 at 18, 38-39; Dep. Inv. 219 at 43; Dep. Inv. 248 at 16, 20-21; Dep. Inv. 252 at 24-25; Dep. Inv. 258 at 43-44; Dep. Inv. 261, at 25; Trial Tr. Jan. 21, 2014, at 55-56 [Dunkel Testimony].)

109. No investor who claimed to have relied on Morningstar understood how Morningstar received and reviewed information about hedge funds. (Dep. Inv. 4 at 34; Dep. Inv. 27 at 25; Dep. Inv. 37 at 28, 34-35; Dep. Inv. 38 at 18-19, 34; Dep. Inv. 44 at 43, 56; Dep. Inv. 45 at 31-32; Dep. Inv. 47 at 43; Dep. Inv. 55 at 31; Dep. Inv. 60 at 44; Dep. Inv. 61 at 24, 33; Dep. Inv. 69 at 24-25; Dep. Inv. 70 at 43; Dep. Inv. 85 at 30; Dep. Inv. 91 at 20; Dep. Inv. 98 at 33-34; Dep. Inv. 104 (JAH) at 37-38; Dep. Inv. 104 (JWH) at 14; Dep. Inv. 110 at 25; Dep. Inv. 131 at 29-31; Dep. Inv. 134 at 40-41; Dep. Inv. 137 at 27; Dep. Inv. 155 at 36, 40, 44; Dep. Inv. 156 at 41; Dep. Inv. 163 at 34; Dep. Inv. 165 at 42; Dep. Inv. 175 at 75; Dep. Inv. 189 at 37; Dep. Inv. 206 at 29-31; Dep. Inv. 211 at 33, 36, 38-39; Dep. Inv. 219 at 43; Dep.

Inv. 233 at 40; Dep. Inv. 236 at 45; Dep. Inv. 248 at 20-23; Dep. Inv. 252 at 23; Dep. Inv. 258 at 42, 45, 48; Dep. Inv. 261 at 23; Trial Tr. Jan 21, 2014, at 31 [Farrow Testimony]; Trial Tr. Jan. 21, 2014, at 49 [Dunkel Testimony]; Trial Tr. Jan. 21, 2014, at 110 [Sharff Testimony].)

110. None of the investors who were aware of Morningstar's rating of the STABL Fund understood how Morningstar assigned the star rating. (Dep. Inv. 27 at 26-27; Dep. Inv. 37 at 19; Dep. Inv. 38 at 30; Dep. Inv. 45 at 16-17; Dep. Inv. 47 at 42; Dep. Inv. 60 at 44; Dep. Inv. 85 at 28; Dep. Inv. 91 at 48-49; Dep. Inv. 98 at 19, 33-34; Dep. Inv. 104 (JWH) at 14; Dep. Inv. 110 at 24; Dep. Inv. 131 at 31; Dep. Inv. 134 at 44; Dep. Inv. 137 at 27-28; Dep. Inv. 155 at 24; Dep. Inv. 156 at 18; Dep. Inv. 163 at 35; Dep. Inv. 165 at 31; Dep. Inv. 175 at 35; Dep. Inv. 189 at 28-29, 37; Dep. Inv. 206 at 30; Dep. Inv. 211 at 29; Dep. Inv. 219 at 43; Dep. Inv. 236 at 45; Dep. Inv. 248 at 22; Dep. Inv. 252 at 23; Dep. Inv. 258 at 41-43; Dep. Inv. 261 at 25; Trial Tr. Jan. 21, 2014, at 25 [Farrow Testimony]; Trial Tr. Jan. 21, 2014, at 48 [Dunkel Testimony]; Trial Tr. Jan. 21, 2014, at 106, 108-109 [Sharff Testimony]. There is no evidence that any of the 40 investors read Morningstar's Hedge Fund Rating Methodology. (Trial Tr. Jan. 13, 2014, morning session, at 220.)

111. Of the 12 investors who saw Morningstar's five-star rating on a document published by Morningstar, nine testified that they did not understand the difference between filled and unfilled stars. (Dep. Inv. 38 at 34; Dep. Inv. 47 at 42-43; Dep. Inv. 98 at 33, Dep. Inv. 104 (JAH) at 39-40; Dep. Inv. 104 (JWH) at 16-17; Dep. Inv. 163 at 35; Dep. Inv. 165 at 57-58; Dep. Inv. 175 at 74-75; Dep. Inv. 189 at 40.) There is no evidence that the remaining three investors who saw the five-star rating knew the difference between filled and unfilled stars or

relied on it. (*See* Dep. Inv. 91; Trial Tr. Jan. 21, 2014 [Sharff Testimony; Dunkel Testimony].)

112. Five of the 40 investors had some experience in finance or real estate or appeared to be sophisticated investors. (Dep. Inv. 4 at 6 (former real estate appraiser); Inv. Dep. 60 at 28 (commercial real estate experience); Dep. Inv. 206 at 8-9 (real estate lawyer); Dep. Inv. 211 at 7 (received a Masters in Business Administration); Trial Tr. Jan. 21, 2014, at 57-121 [Sharff Testimony].)

113. Of the 40 investors, only one—David Sharff—was a subscriber to Morningstar at the time he invested. (Trial Tr. Jan. 21, 2014, at 67-68 [Sharff Testimony].)

114. Morningstar was not acting as an investment advisor to any of the 40 investors. (Trial Tr. Jan. 13, 2014, morning session, at 172.)

115. The STABL Fund required investors to sign a subscription agreement, sign an operating agreement, and fill out an investor questionnaire. (Stinson Dep. at 20.) The subscription agreement stated: "The Manager has made available to the Subscriber . . . full and complete information concerning the financial structure, liquidity and other risks of the Fund, and any and all data requested by the Subscriber as a basis for estimating the potential profits and losses of the Fund . . . ." (Trial Ex. 213 at 6.) The subscription agreement further stated: "The Subscriber has had an unrestricted opportunity to: (i) obtain additional information concerning the offering of Interests pursuant to the Offering Memorandum, the Interests, the Manager, the Company and any other matters relating directly or indirectly to the Subscriber's purchase of the Interest; and (ii) ask questions of, and has received answers and information from, the Manager concerning the terms and conditions of the Offering . . . ." (*Id*.)

116. There is no evidence that Morningstar knew information about the STABL Fund that investors did not also have access to.


## II.    CONCLUSIONS OF LAW

### A.    Contribution Under Rule 10b-5

Section 10(b) of the Securities Exchange Act prohibits the "use or employ, in connection with the purchase or sale of any security . . . , [of] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe . . . ." 15 U.S.C. § 78j(b). Rule 10b-5, promulgated under § 10(b), makes it unlawful for any person "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading . . . in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b-5(b).

The Supreme Court has held that defendants in a Rule 10b-5 action have a right to seek contribution from joint tortfeasors. *Musick, Peeler & Garrett v. Emp'rs Ins. of Wausau*, 508 U.S. 286, 288 (1993). *Musick* dealt with a claim for contribution for a judgment obtained in a private action. However, the Supreme Court did not explicitly exclude claims for contribution in cases such as the one before this Court, where the judgment was obtained in an enforcement proceeding brought by the Securities and Exchange Commission. *See id.* at 298 (stating generally that "[t]hose charged with liability in a 10b-5 action have a right to contribution against other parties who have joint responsibility for the violation"). In denying Morningstar's motion to dismiss, this Court held that the Receiver could bring a claim for contribution against Morningstar, and the Court will continue to follow its previous holding. *See In re Pharmacy*

*Benefit Managers Antitrust Litig.*, 582 F.3d 432, 439 (3d Cir. 2009) ("'[W]hen a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.'" (quoting *Arizona v. California*, 460 U.S. 605, 618 (1983)).

To prevail on his claim for contribution, the Receiver must establish all the elements of a claim under Rule 10b-5. *See Musick*, 508 U.S. at 298; *Ades v. Deloitte & Touche*, Civ. A. Nos. 90-4959, 90-5056, 1993 WL 362364, at *10 (S.D.N.Y. Sept. 17, 1993) ("A claim for contribution under the federal securities laws . . . requires a third-party plaintiff to allege all the elements of the offense against a third-party defendant in order to prevail."). The Receiver therefore must establish that Morningstar (1) made a misstatement or an omission of a material fact (2) with scienter (3) in connection with the purchase or the sale of a security (4) upon which investors reasonably relied, and (5) that the misrepresentation proximately caused the injury. *McCabe v. Ernst & Young, LLP*, 494 F.3d 418, 426 (3d Cir. 2007); *AES Corp. v. Dow Chemical Co.*, 325 F.3d 174, 178 (3d Cir. 2003). The Court finds that Morningstar is not liable under Rule 10b-5 for two reasons: Morningstar did not act with scienter, and investors' reliance on Morningstar's misrepresentations was not reasonable.

### 1.   *Misstatements or omissions of material fact*

Under the first element of Rule 10b-5, the Receiver must establish that Morningstar made a misstatement or omission of a material fact. The Receiver identifies a number of misstatements and omissions that he claims establish this first element.

### a.   *Misstatements*

To support liability under Rule 10b-5, a factual statement must be: (1) false or misleading; (2) material; and (3) "made" by the defendant. *Oran v. Stafford*, 226 F.3d 275, 282 (3d Cir. 2000). "[A] statement is false or misleading if it is factually inaccurate, or additional

information is required to clarify it." *In re Adolor Corp. Secs. Litig.*, 616 F. Supp. 2d 551, 565 (E.D. Pa. 2009) (quoting *Wallace v. Sys. & Computer Tech. Corp.*, Civ. A. No. 95-6303, 1997 WL 602808, at *9 (E.D. Pa. Sept. 23, 1997)). Material information is "information that would be important to a reasonable investor in making his or her investment decision." *United States v. Schiff*, 602 F.3d 152, 171 (3d Cir. 2010) (internal quotation marks omitted).

The Court finds that the following eight statements, published on Morningstar.com or Morningstar Alternative Investment Center, were false and material: (1) the STABL Fund's returns; (2) the STABL Fund's net assets; (3) a description of the STABL Fund's investment strategy; (4) information about Stinson's biography; (5) the identities of the STABL Fund's lawyer, auditor, and custodian; (6) the five-star rating that Morningstar gave the STABL Fund; (7) "risk measurements" based on the STABL Fund's returns; and (8) figures on the number of months that the STABL Fund's returns were positive and the number of months that the returns were negative. Stinson provided Morningstar with the information in the first five statements, and Stinson testified that that information was false. The five-star rating was also false because it represented that the STABL Fund's returns, adjusted according to an algorithm, were within the top 10% of adjusted returns of funds with similar investment strategies. Because the STABL Fund's returns were false, the information conveyed by the five-star rating was false. The information on Morningstar's website about the STABL Fund's risk measurements and the number of months of positive returns was also false because that information was based on false returns data. In addition, all eight statements were material because a reasonable investor would view these statements as important in deciding whether to invest in the STABL Fund.

A more complex question is whether these eight statements were made by Morningstar, as required under Rule 10b-5. The Supreme Court has held that the "maker of a statement is the

person or entity with ultimate authority over the statement, including its content and whether and how to communicate it." *Janus Capital Grp. v. First Derivative Traders*, 131 S. Ct. 2296, 2302 (2011). The maker of the statement is not necessarily the creator of that statement, but rather the party who "takes credit—or blame—for what is ultimately said." *Id.* at 2302-03. The Supreme Court further noted that "[i]n the ordinary case, attribution within a statement or implicit from surrounding circumstances is strong evidence that a statement was made by—and only by—the party to whom it is attributed." *Id.* at 2302. The Supreme Court did not discuss how clear the attribution must be, or how tight the nexus must be between the statement and the attribution. One district court, in an opinion that predated *Janus*, treated as relevant both the investor's understanding about whom the statements were being attributed to, and any suggestion by the speaker that it had vetted or endorsed the information. *Thomas H. Lee Equity Fund V, LP v. Mayer Brown, Rowe & Maw LLP*, 612 F. Supp. 2d 267, 277-78 (S.D.N.Y. 2009) (holding that a law firm could not be held liable under Rule 10b-5 for a lawyer's statements where the lawyer expressly attributed the statements to his client).

The eight statements about the STABL Fund on Morningstar's website can be divided into two categories. In five of the statements, Morningstar merely repeated information that Stinson had conveyed, while the three remaining statements were calculations by Morningstar based on information reported by Stinson. The latter three statements were the five-star rating, the "risk measurements," and the number of months that the STABL Fund had positive and negative returns. The Court finds that Morningstar is the "maker" of these three statements because Morningstar had "ultimate authority" over these statements, including over their content, and could not reasonably attribute them to the STABL Fund. *See Janus*, 131 S. Ct. at 2302. That some investors heard about Morningstar's five-star rating from a third party, and not from a

document published by Morningstar, does not change Morningstar's status as the "maker" of that statement. *See id.* at 2305 n.11 ("[A]s long as a statement is made, it does not matter whether the statement was communicated directly or indirectly to the recipient.").

It is a closer question whether Morningstar "made" the remaining five statements—about the STABL Fund's returns, the fund's investment strategy, the fund's assets, Stinson's biography, and professionals affiliated with the fund. These statements simply repeated information that Stinson had provided to Morningstar. Whether Morningstar made these statements depends on whether the information was expressly or implicitly attributed to Stinson. *See Janus*, 131 S. Ct. at 2302. Information about the STABL Fund's returns, assets, and investment strategy was published on Morningstar Alternative Investment Center without attribution. In addition, all five statements were published in the Morningstar Report on Morningstar.com without attribution. Although Morningstar stated on the first page of the Morningstar Report that it "depends on each individual hedge fund to provide it with accurate information," that disclaimer is not specific enough to attribute each statement in the entire six-page report to the STABL Fund. In addition, Morningstar had "ultimate authority" over the decision "whether and how" to convey to investors the information that the STABL Fund had reported. *See Janus*, 131 S. Ct. at 2302. Because Morningstar chose to publish the STABL Fund's data, and because Morningstar did not specifically attribute these data to Stinson, the Court finds that Morningstar was the maker of all the statements about the STABL Fund on Morningstar's website. Therefore, Morningstar made material misstatements about the STABL Fund's returns, the fund's star rating, its net assets, its investment strategy, professionals affiliated with the fund, its "risk measurements," Stinson's biography, and the number of months that the fund had positive and negative returns.

31

In addition to these eight statements, the Receiver seeks to hold Morningstar liable for general statements about its hedge fund database, and for representing the star rating with filled stars, even though Morningstar's Rating Methodology stated that unfilled stars would be used to distinguish hedge funds from mutual funds. (Pl.'s Proposed Conclusions of Law [Pl.'s PCOL] ¶ 13.) The Court need not analyze whether these statements were false and material because investors did not rely on these statements in deciding to invest. Reliance is a separate requirement under Rule 10b-5 and will be discussed below.

### b.    Omissions

The Receiver also seeks to hold Morningstar liable for failing to disclose the following facts: (1) that Morningstar had assigned three "risk flags" to the STABL Fund; (2) that the STABL Fund triggered a fourth risk flag based on its return pattern; (3) that the "risk measurements" published in the Morningstar Report were generated from unverified data reported by the STABL Fund; (4) that the star ratings were based on estimated or self-reported returns data; and (5) that the STABL Fund's returns data were unaudited. (Pl.'s PCOL ¶¶ 10(e), (m), (o), (q), (r).) However, Morningstar did disclose most of these facts. The Morningstar Report, in which the risk measurements were published, stated that the information in the report was based on data reported by hedge funds and was not guaranteed to be accurate. Morningstar also disclosed in its publically-available Rating Methodology that the returns data it published could be estimates or unaudited, and that the star ratings were based on these data. Morningstar also cannot be held liable for failing to assign a risk flag to the STABL Fund based on its returns pattern because the STABL Fund did not meet the requirements for this risk flag.

The Court now turns to the question whether Morningstar may be held liable for failing to disclose, on Morningstar.com, that Morningstar had assigned three other risk flags to the

STABL Fund. Morningstar developed its risk flag system in January 2010 to alert investors to the possibility of fraud or mismanagement, and to encourage investors to do further research on flagged funds. In April 2010, Morningstar assigned three risk flags to the STABL Fund because the fund did not register with a regulatory body, and it did not have the same auditor or administrator as five other funds in the hedge fund database. Morningstar disclosed these risk flags only on Morningstar Alternative Investment Center, and not on Morningstar.com. Because of the high price of Morningstar Alternative Investment Center, many potential investors did not have access to this information. The Receiver argues that Morningstar had a duty to disclose the STABL Fund's risk flags on Morningstar.com.

Rule 10b-5 makes it unlawful to "omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b). An omission can support liability under Rule 10b-5 only if (1) the omitted fact is material, and (2) the defendant had a duty to disclose the omitted fact. *Oran*, 226 F.3d at 282, 285. Both requirements are met with respect to two of the three risk flags that Morningstar assigned to the STABL Fund.

An omitted fact is material if there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988) (internal citations omitted). The Court finds that the STABL Fund's risk flags for "auditor" and "registration" were material. A rigorous audit and registration with a regulatory body reduce the likelihood that a hedge fund is fraudulent or mismanaged. Information that the STABL Fund had an obscure auditor and did not register may have changed investors' view of the STABL Fund as a sound investment. These facts would have raised questions about the

accuracy of information that Morningstar published about the STABL Fund's returns and net assets. Therefore, the disclosure of the STABL Fund's risk flags for "auditor" and "registration" would have significantly altered the total available mix of information about the STABL Fund.

In addition, Morningstar had a duty to disclose these risk flags. "[A] duty to disclose may arise when there is insider trading, a statute requiring disclosure, or an inaccurate, incomplete or misleading prior disclosure." *Oran*, 226 F.3d at 285-86. An inaccurate statement gives rise to a duty to disclose additional information that contradicts the initial statement. *See Shapiro v. UJB Financial Corp.*, 964 F.2d 272, 282 (3d Cir. 1992) (holding that "if a defendant represents that its lending practices are 'conservative' and that its collateralization is 'adequate,' the securities laws are clearly implicated if it nevertheless intentionally or recklessly omits certain facts contradicting these representations"); *see also In re Burlington Coat Factory Secs. Litig.*, 114 F.3d 1410, 1430-31 (3d Cir. 1997) (finding that a party who makes a statement believing it to be true, but later learns that it is false, has a "duty to correct" that statement within a reasonable time). The Third Circuit has approved an articulation of the duty to disclose as a "duty to communicate any additional or qualifying information, then known, the absence of which would render misleading that which was communicated." *Kline v. First Western Gov't Secs., Inc.*, 24 F.3d 480, 491 (3d Cir. 1994) (internal quotation marks omitted). Because Morningstar published the STABL Fund's returns on Morningstar.com, Morningstar had a duty to disclose to users of Morningstar.com that the STABL Fund had triggered two risk flags. These risk flags, which reflected the absence of certain checks on fraud, cast doubt on the veracity of Morningstar's statements about the STABL Fund's returns. That the risk flags were material further supports a finding that Morningstar had a duty to disclose them. *See In re Time Warner*, 9 F.3d at 268 (noting that if an omitted fact is material, "it is difficult to imagine a circumstance where the

prior statement would not be rendered misleading in the absence of the disclosure"); *In re CDNOW, Inc. Secs. Litig.*, 138 F. Supp. 2d 624, 635 n.12 (E.D. Pa. 2001) (citing *Time Warner* for the proposition that "the materiality and disclosure inquiry coalesce" when the duty to disclose arises from a prior misleading statement). Because the two risk flags were material and necessary to make Morningstar's statements about the STABL Fund not misleading, Morningstar's failure to disclose these risk flags is a material omission within the language of Rule 10b-5.

### 2. *Scienter*

To prevail under Rule 10b-5, the Receiver must prove that Morningstar acted with scienter when it omitted the two risk flags or when it made one of the eight misstatements that the Court identified above. Scienter is a "mental state embracing intent to deceive, manipulate or defraud . . . and requires a knowing or reckless state of mind." *Institutional Investors Grp. v. Avaya, Inc.*, 564 F.3d 242, 252 (3d Cir. 2009) (internal quotation marks and citations omitted). "A reckless statement [or omission] is one involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Id.* at 267 n.42. The "standards of ordinary care" depend on what a "reasonable" member of the same profession would do. *See In re Ikon Office Solutions*, 277 F.3d 658, 669 (3d Cir. 2002); *see also In re Puda Coal Secs. Inc. Litig.*, Civ. A. No. 11-2598, 2014 WL 2915880, at *13 (S.D.N.Y. June 26, 2014) (defining the standard of care as "what others in the field would expect"). In a lawsuit against an auditor who approved financial statements containing inaccuracies, the Third Circuit required a showing that the auditor's "judgment—at the moment exercised—was sufficiently egregious such that a

reasonable accountant reviewing the facts and figures should have concluded that . . . [the] financial statements were misstated and that as a result the public was likely to be misled." *In re Ikon Office Solutions*, 277 F.3d at 673.

There is no evidence that Morningstar knew it was deceiving investors. The Receiver seeks to establish knowledge by arguing that Morningstar "concoct[ed]" a false repeating monthly return pattern of 0%, 0%, 4% for the STABL Fund, even though Keystone, Stinson's company, reported monthly returns of 1.333%. (Pl.'s PCOL ¶ 10(c).) However, the evidence suggests, and the Court finds, that a Morningstar data analyst entered monthly returns of 1.333% into the database, and Keystone, which had access to the database, later changed the returns to a repeating pattern of 0%, 0%, 4%. Even if Morningstar entered returns of 0%, 0%, 4% into its database, there is no evidence that Morningstar fabricated those data or knew that the data were false.

The Court further finds that Morningstar did not recklessly disregard the likelihood of deceiving investors. The Receiver argues that the returns data reported by the STABL Fund must have alerted Morningstar to Stinson's fraud. The Receiver's expert, David Wiley, testified that the returns data initially reported by the STABL Fund—1.333% monthly for thirty months—were "clearly fraudulent," given the STABL Fund's high-risk investment strategy. (Trial Tr. Jan. 13, 2014, morning session, at 80-81.) However, the Court is not persuaded by Wiley's opinion. The basis for Wiley's opinion was his search of Morningstar's database, within the Global Debt category, for words similar to the words that the STABL Fund used to describe its investment strategy. Wiley did not find any other hedge funds that reported returns similar to the STABL Fund's returns. (*Id.*) This search is not an adequate basis for Wiley's opinion because many hedge funds are not in the Global Debt category or are not in Morningstar's database at all. In

addition, returns may be unusual without being fraudulent. The Court finds more persuasive the testimony by Morningstar's expert, Leon Metzger, that the STABL Fund's reported returns were "plausible." Metzger worked in operations roles at a hedge fund management company for 18 years, and he has taught a class on operating a hedge fund 29 times at various universities. (Trial Tr. Jan. 27, 2014, afternoon session, at 19-21.) The Court believes that Metzger has greater expertise on hedge funds than Wiley, who has worked on issues relating to hedge funds but has not focused on them. (Trial Tr. Jan. 13, 2014, morning session, at 38-47; Wiley Report App. C.) The Court credits the three possible explanations that Metzger offered for the STABL Fund's constant returns: a set-up to avoid a tax burden, an agreement to pay investors a fixed rate, and an investment strategy that has a high probability of a stable return and a low probability of catastrophic loss. Because there were plausible explanations for the constant returns that the STABL Fund reported, those returns were not an obvious indication of fraud. That Barclays's DataFinder, another hedge fund database, also published the STABL Fund's returns supports the Court's finding that these returns were not clearly fraudulent. *See In re Ikon Office Solutions*, 277 F.3d at 669 (finding that an independent accounting firm's approval of the defendant's audit opinion was relevant to the question whether the defendant issued the opinion with scienter). That Morningstar was generally aware of the risk that self-reported hedge fund data might be inaccurate does not show that Morningstar knew or must have known that the STABL Fund's data were inaccurate. Therefore, the Receiver cannot establish scienter based on Morningstar's acceptance of the STABL Fund's returns data.

None of the other information that Stinson reported to Morningstar was obviously false. Stinson reported various versions of his biography, but these versions were not obviously inconsistent or inaccurate. Similarly, the STABL Fund's requirement of $5,000 as a minimum

investment is not obviously suspicious. The minimum is low, given that Keystone indicated to Morningstar that investors in the STABL Fund were required to have a total of $5 million in investments. (Trial Tr. Jan. 13, 2014, morning session, at 70; Trial Tr. Jan. 27, 2014, afternoon session, at 67-68.) However, a low minimum investment is not an obvious indication of fraud. The Court further finds that the STABL Fund's consistent monthly net asset value did not clearly reflect fraud. Wiley testified that a consistent monthly net asset value per share is "highly irregular, suspicious." (Trial Tr. Jan. 13, 2014, morning session, at 122.) The basis for Wiley's testimony is that no other hedge fund in the Global Debt category had consistent monthly net asset values. (Trial Tr. Jan. 13, 2014, morning session, at 124.) However, as explained above, the hedge funds in the Global Debt category are a limited sample. And even if a constant net asset value is unusual, it is not clearly fraudulent.

Morningstar also did not act knowingly or recklessly in failing to disclose the STABL Fund's risk flags on Morningstar.com, or in continuing to publish information about the STABL Fund after identifying the risk flags. The risk flags assigned to the STABL Fund reflected the absence of certain checks on fraud, but these flags did not alone indicate fraud. Indeed, half of the hedge funds in Morningstar's database had three or four risk flags. Therefore, the risk flags were not a clear reflection of fraud, and Morningstar's failure to disclose them did not present an obvious danger of misleading investors. *Cf. In re Ikon Office Solutions*, 277 F.3d at 671 (finding that a company's auditor did not act with scienter in issuing a favorable audit opinion, even though the auditor had identified potential risks relating to the company's practices).

The Receiver asks the Court to infer scienter based on a number of other actions by Morningstar, including its placement of the STABL Fund in the Global Debt category, its decision to treat returns of 0% as positive, and its use of filled stars in the star rating, contrary to

its methodology. (Pl.'s PCOL ¶ 10(i), (l), (p).) However, there is no evidence that Morningstar took these actions intending to deceive investors or with reckless disregard of the likelihood of deception.

In sum, the Court finds that Morningstar did not act with knowledge or recklessness in making false statements about the STABL Fund, or in omitting risk flags from Morningstar.com. The absence of scienter precludes liability under Rule 10b-5.

### 3. *Reasonable reliance*

Rule 10b-5 requires a demonstration that the investor relied on the defendant's misstatements, and that the investor's reliance was reasonable. *AES Corp.*, 325 F.3d at 178.

#### a. *Reliance*

The "traditional" way to demonstrate reliance is by showing that the investor "was aware of a company's statement and engaged in a relevant transaction . . . based on that specific misrepresentation." *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398, 2407 (2014) (internal quotation marks omitted). However, a presumption of reliance applies in "cases 'involving primarily a failure to disclose' material facts by defendants obligated to disclose such facts." *Malack v. BDO Seidman, LLP*, 617 F.3d 743, 747 (3d Cir. 2010) (quoting *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153 (1972)). In cases that primarily involve omissions, the defendant bears the burden of showing that the investor would have invested even if the defendant had disclosed the omitted fact. *Gallup v. Clarion Sintered Metals, Inc.*, 489 F. App'x 553, 557 (3d Cir. 2010); *Rochez Bros., Inc. v. Rhoades*, 491 F.2d 402, 410 (3d Cir. 1974). In cases involving both omissions and misrepresentations, the Third Circuit has directed courts to impose the burden regarding reliance on only one of the parties, depending on "whether the

offenses can be characterized primarily as omissions or misrepresentations." *Johnston v. HBO Film Mgmt., Inc.*, 265 F.3d 178, 192 (3d Cir. 2001).

The Court finds that the presumption of reliance should not apply here because the Receiver's claims are based primarily on Morningstar's statements, not its omission. As explained above, Morningstar made eight material misstatements about the STABL Fund and omitted only one material fact—the existence of the two risk flags. In addition, Morningstar had a duty to disclose the risk flags only because it had published, and was continuing to publish, false statements about the STABL Fund, and the risk flags were important for investors to evaluate the accuracy of those statements. *Cf. Johnston,* 265 F.3d at 193 (declining to presume reliance in part because "the omission alleged would have no impact absent the misrepresentation, or in other words, a misrepresentation is necessary to create the specific expectation that the omission does not negate"). Further, this case is a poor fit for the rationale behind the presumption of reliance—that reliance on an omission is difficult or impossible to prove. *See Sharp v. Coopers & Lybrand*, 649 F.2d 175, 188 (3d Cir. 1981), *overruled in part on other grounds by In re Data Access Sys. Secs. Litig.*, 843 F.2d 1537 (3d Cir. 1988). Reliance should not be difficult for the Receiver to prove, if it exists, because Morningstar made several material misstatements of which investors were aware. *See Johnston*, 265 F.3d at 193 (finding relevant that "this case is not one where reliance would be difficult for the plaintiffs to prove, while it would be extraordinarily difficult for the defendants to disprove, as presumably plaintiffs know whether they acted on or as a result of the information made available to them"). Therefore, the Court will not apply the presumption of reliance in this case. The Receiver can prevail under Rule 10b-5 only if he establishes that the investors reasonably relied on Morningstar's misrepresentations.

To establish reliance, a plaintiff must show that "but for the fraudulent misrepresentation, the investor would not have purchased or sold the security." *Berckeley Inv. Grp., Ltd. v. Colkitt*, 455 F.3d 195, 222 (3d Cir. 2006) (internal quotation marks omitted). Most of the 40 testifying investors based their decisions to invest, in part, on at least one of the eight material misstatements that the Court listed above.[2] As explained earlier, these misstatements were about the STABL Fund's returns, its investment strategy, its net assets, its risk measurements, its five-star rating, Stinson's biography, professionals associated with the fund, and the number of months that the fund reported positive returns. Only 15 investors testified that they would not have invested if they had not been aware of Morningstar's statements. It is a close question whether the remaining 25 investors would have invested in the absence of Morningstar's statements. However, even if these investors relied on Morningstar within the meaning of Rule 10b-5, their reliance cannot support liability because it was unreasonable.

> b.    *Reasonableness*

Fatal to the Receiver's claim is that no investor acted reasonably in relying on Morningstar's misrepresentations about the STABL Fund. The "reasonable reliance" element of Rule 10b-5 requires that investors "exercised the diligence that a reasonable person under all of the circumstances would have exercised to protect his own interests." *Malack*, 617 F.3d at 747. The Third Circuit has identified a non-exclusive set of factors to aid in determining whether an investor's reliance was reasonable. These factors are: (1) the existence of a fiduciary relationship

---

[2] In addition to these eight misstatements, the Receiver seeks to hold Morningstar liable for its general statements about the quality of Morningstar's hedge fund database. (Pl.'s PCOL ¶ 13.) However, these general statements cannot support liability because no investor was aware of them. *See Erica P. John Fund*, 134 S. Ct. at 2407. The Receiver also seeks to hold Morningstar liable for using filled stars in its star rating of the STABL Fund, in violation of Morningstar's Rating Methodology. However, no investor understood the difference between filled and unfilled stars or relied on that difference in investing.

between the investor and the defendant; (2) whether the investor had an opportunity to detect the fraud; (3) the investor's sophistication; (4) the existence of longstanding business or personal relationships between the investor and the defendant; and (5) the investor's access to relevant information. *See AES Corp.*, 325 F.3d at 178-79 (citing *Straub v. Vaisman & Co.*, 540 F.2d 591, 598 (3d Cir. 1976)).

Of these five factors, the third *Straub* factor is the only factor that favors the Receiver. Of the 40 investors who testified, only five were sophisticated. As to the first and fourth *Straub* factors, Morningstar did not have a fiduciary relationship with any of the investors, and it had a business relationship with only one investor, who had a subscription to Morningstar at the time of his investment. As to the second and fifth *Straub* factors, all 40 investors had access to information that would have enabled them to detect the fraud. The STABL Fund's investment contract gave investors access to the fund's books and records. If, as the Receiver alleges, the data that the STABL Fund reported was suspicious, investors should have been able to discover that by talking to financial advisors. Investors also could have checked Stinson's criminal record, which was lengthy. *See SEC v. Stinson*, Civ. A. No. 10-3130, 2011 WL 2462038, at *4 (E.D. Pa. June 20, 2011).

The investors also had access to information relevant to their decision to rely on Morningstar's listing and rating of the STABL Fund. While Morningstar's statements about its review of hedge fund data are conflicting, most of these statements alerted investors that they should not rely on data published by Morningstar without doing independent research. Morningstar's Rating Methodology, which was publically available on Morningstar's website, indicated that Morningstar did not verify data reported by hedge funds before publishing it or using it to calculate the star rating. Morningstar's subscription agreement further stated that

Morningstar did not guarantee the accuracy of hedge fund data on its website. While investors did not read these disclaimers, investors would have viewed them if they had researched Morningstar's website or signed up for a subscription, which Morningstar intended to be a prerequisite for access to hedge fund data. In addition, 16 investors viewed a disclaimer in the Morningstar Report stating that "Morningstar depends on each individual hedge fund to provide it with accurate information." Such disclaimers make it more difficult for an investor to prove that his reliance was reasonable. *See AES Corp.*, 325 F.3d at 181; *Kline*, 24 F.3d at 487 (noting that "[t]he presence and character of disclaimers has clear relevance to [the] determination" whether reliance is reasonable). Although investors had access to information about the STABL Fund and about the basis for Morningstar's statements, few investors conducted research before investing. None conducted sufficient research to understand how Morningstar reviewed hedge fund data or assigned star ratings. Investors therefore did not exercise reasonable diligence in deciding to invest in the STABL Fund based on Morningstar's statements. No personal, business, or fiduciary relationship justified investors' decision to rely on Morningstar's statements without understanding the significance of those statements or doing independent research into the STABL Fund.

### 4.    *Conclusion on Rule 10b-5 Claim*

In sum, the Receiver cannot prevail on his claim for contribution against Morningstar because he cannot establish two of the five elements required for liability under Rule 10b-5. Morningstar did not act with scienter in making misstatements or omissions, and investors' reliance on Morningstar's misrepresentations was unreasonable. The Court therefore need not discuss the remaining two factors required under Rule 10b-5—whether Morningstar's statements

and omissions were made in connection with the purchase or sale of a security, and whether these statements and omissions proximately caused investors' losses.

### B.    Aiding and Abetting Fraud and Breach of Fiduciary Duty

The Receiver alleges that Morningstar, by listing and rating the STABL Fund, aided and abetted Stinson's fraud and his breach of fiduciary duty to the Receivership Entities. The Pennsylvania Supreme Court has not expressly recognized causes of action for aiding and abetting fraud or aiding or abetting breach of fiduciary duty. Therefore, this Court must predict how the Pennsylvania Supreme Court would rule, giving proper regard to the decisions of Pennsylvania's lower state courts. *Rolick v. Collins Pine Co.*, 925 F.2d 661, 664 (3d Cir. 1991).

Numerous state and federal judges have predicted that the Pennsylvania Supreme Court would recognize a cause of action for aiding and abetting breach of fiduciary duty. *See Chicago Title Ins. Co. v. Lexington & Concord Search & Abstract, LLC*, 513 F. Supp. 2d 304, 318 (E.D. Pa. 2007) (collecting cases in which a "vast majority of district courts" in the Third Circuit recognized a claim of aiding and abetting breach of fiduciary duty under Pennsylvania law); *see also Official Comm. of Unsecured Creditors of Allegheny Health Educ. & Research Found. v. PriceWaterhouseCoopers, LLP*, 989 A.2d 313, 327 n.14 (Pa. 2010) (noting, in dicta, that "[u]nder present Pennsylvania law as established by the Commonwealth Court as the highest appellate court which has reached the issue, aiding and abetting a breach of fiduciary duty is a recognized cause of action" (citing *Koken v. Steinberg*, 825 A.2d 723, 732 (Pa. Commw. Ct. 2003)). This Court will follow the weight of authority and recognize a cause of action under Pennsylvania law for aiding and abetting breach of fiduciary duty.

There is greater disagreement over whether a cause of action exists under Pennsylvania law for aiding and abetting fraud. *Compare Zafarana v. Pfizer, Inc.*, 724 F. Supp. 2d 545, 560

(E.D. Pa. 2010) (no cause of action), *with Panthera Rail Car LLC v. Kasgro Rail Corp*., Civ. A. No. 13-679, 2013 WL 4500468, at *8 (W.D. Pa. Aug. 21, 2013) (finding a cause of action). Even if such a cause of action exists, however, Morningstar is not liable for the following reasons.

Courts that recognize claims for aiding and abetting fraud and breach of fiduciary duty have applied § 876 of the Second Restatement of Torts to such claims. *See Panthera Rail Car LLC*, 2013 WL 4500468, at *8-9; *Fulton Bank, N.A. v. UBS Secs., LLC*, Civ. A. No. 10-1093, 2011 WL 5386376, at *16 (E.D. Pa. Nov. 7, 2011); *Sovereign Bank v. Valentino*, 914 A.2d 415, 421 (Pa. Super. Ct. 2006); *Koken*, 825 A.2d at 731. The Receiver seeks to ground liability in each of two subsections of § 876.

First, the Receiver argues that Morningstar is liable for Stinson's fraud and breach of fiduciary duty under § 876(b), which states: "For harm resulting to a third person from the tortious conduct of another, one is subject to liability if he . . . knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself." The Third Circuit has found that actual knowledge is required to establish a claim under § 876(b). *Reis v. Barley, Snyder, Senft & Cohen, LLC*, 426 F. App'x 79, 84 (3d Cir. 2011) (affirming the district court's judgment for the defendant in a claim for aiding and abetting breach of fiduciary duty on the grounds that the defendant "did not *actually* know" about the breach). In addition, the plain language of § 876(b) supports a requirement of actual knowledge. Because Morningstar did not know that Stinson had breached a fiduciary duty to his companies, Morningstar cannot be liable for aiding and abetting his breach. Even if recklessness were sufficient under § 876(b), Morningstar would not be liable, as explained above in the discussion on scienter.

The Receiver also seeks to hold Morningstar liable based on § 876(c) of the Second Restatement of Torts, which states: "For harm resulting to a third person from the tortious conduct of another, one is subject to liability if he . . . gives substantial assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to the third person." The Receiver argues, based on Wiley's expert testimony, that Morningstar had a duty to evaluate hedge fund data for "reasonableness," given the fund's investment strategy and market conditions. (Pl.'s PCOL ¶ 42; Pl.'s Proposed Findings of Fact [Pl.'s PFOF] ¶¶ 39-41.) The Receiver argues that Morningstar breached that duty by failing to detect obvious indicia of Stinson's fraud. (Pl.'s PCOL ¶ 10.) The Receiver further claims that Morningstar breached its duty to refrain from knowingly or recklessly making false statements or omitting material information. (Pl.'s PCOL ¶ 6.) However, the Court finds that even if Morningstar had these duties to investors, Morningstar did not breach these duties. As explained above, the information that Stinson reported to Morningstar was plausible and did not clearly indicate fraud. Further, the comment to Restatement § 876(c) states that "one who supplies another with the means of committing a tort is not liable if he has no reason to suppose that a tort will be committed." Restatement (Second) of Torts § 876(c) cmt. e. Morningstar had no reason to believe that Stinson would use the Morningstar listing and rating to attract investments in a Ponzi scheme.

Because Morningstar is not liable for aiding and abetting Stinson's torts under the Restatement, the Court will not address Morningstar's arguments that the *in pari delicto* doctrine bars the Receiver's claims, that the Receivership Entities were not harmed by Morningstar, and that Morningstar's product user agreement limits its liability.

**III**.    **CONCLUSION**

Morningstar is not liable to the Receivership Entities under § 10(b) and Rule 10b-5 because Morningstar did not act with scienter, and because it was not reasonable for investors to rely on Morningstar's statements. Morningstar is not liable to the Receivership Entities for aiding and abetting Stinson's fraud or for aiding and abetting Stinson's breach of fiduciary duty because Morningstar did not know about Stinson's torts and because Morningstar did not breach a duty to investors in Stinson's funds.

This outcome is necessitated by Congress's failure to effectively regulate agencies that publish information about investment vehicles. Although Rule 10b-5 does not cover Morningstar's conduct, Congress could take further action to prevent databases such as Morningstar's from publishing hedge fund data without checking its accuracy. Morningstar's approach to collecting and publishing data is best described as "garbage in, garbage out." In the absence of meaningful regulation, this Court is powerless to protect investors from such "garbage." Judgment will be entered in favor of Morningstar and against the Receiver.